# Exhibit C

Not Reported in A.3d, 2011 WL 1135016 (Del.Ch.)
**(Cite as: 2011 WL 1135016 (Del.Ch.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
In re ALLION HEALTHCARE INC. SHAREHOLDERS LITIGATION.

Civil Action No. 5022–CC.
Submitted: March 11, 2011.
Decided: March 29, 2011.

Pamela S. Tikellis, Robert J. Kriner, Jr., A. Zachary Naylor and Tiffany J. Cramer, of Chimicles & Tikellis LLP, Wilmington, Delaware; Of Counsel: Mark R. Rosen and Lisa M. Lamb, of Barrack, Rodos & Bacine, Philadelphia, Pennsylvania; James M. Hughes, William S. Norton, Joshua C. Littlejohn and J. Brandon Walker, of Motley Rice LLC, Mt. Pleasant, South Carolina, Attorneys for Plaintiffs and the Class.

C. Barr Flinn and Kathaleen St. J. McCormick, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Of Counsel: Scott P. Hilsen, of Alston & Bird LLP, Atlanta, Georgia; Jason S. Oletsky, of Akerman Senterfitt LLP, Ft. Lauderdale, Florida, Attorneys for Defendants Michael P. Moran, Flint D. Besecker, Kevin D. Stepanuk, William R. Miller, Gary P. Carpenter, Willard T. Derr, Allion Healthcare, Inc., H.I.G. Capital, LLC, Brickell Bay Acquisition Corp. and Brickell Bay Merger Corp.

Sheldon K. Rennie, of Fox Rothschild, LLP, Wilmington, Delaware; Of Counsel: Gerald E. Arth, of Fox Rothschild, LLP, Philadelphia, Pennsylvania, Attorneys for Defendants Parallex LLC and Raymond A. Mirra Jr.

David A. Jenkins, of Smith, Katzenstein & Jenkins LLP, Wilmington, Delaware; Of Counsel: Christopher J. Keller and Ethan D. Wohl, of Labaton Sucharow LLP, New York, New York; Eduard Korsinsky, Eric M. Andersen and Shannon L. Hopkins, of Levi & Korsinsky, LLP, New York, New York, Attorneys for Proposed Intervenors Objectors Denise Fowler and Steamfitters Local Union 449.

*MEMORANDUM OPINION*
CHANDLER, Chancellor.

**\*1** On January 19, 2011, I approved a settlement between defendants [FN1] and Delaware plaintiffs in this action, over the objection of New York plaintiffs. I also approved certification of the settlement class and a fee award totaling $1 million, which constituted a $250,000 disclosure fee award and a $750,000 increased share price fee award. The issue before me now relates to the division of those attorneys' fees between counsel for the Delaware plaintiffs and counsel for the New York plaintiffs. This opinion resolves that dispute.

> FN1. Defendants are Allion Heathcare, Inc., H.I.G. Capital, LLC, Michael P. Moran, Flint D. Besecker, Kevin D. Stepanuk, William R. Miller, Gary P. Carpenter, Willard T. Derr, Brickell Bay Acquisition Corp., Brickell Bay Merger Corp., Parallex LLC, and Raymond A. Mirra Jr.

**I. FACTS AND PROCEDURAL HISTORY**
*A. Background*

The underlying litigation involved a going-private transaction whereby Allion Healthcare, Inc. merged with affiliates of private investment firm H.I.G. Capital, LLC [FN2] and a group of Allion stockholders, who together owned a controlling block of about 41% of Allion's common stock.[FN3] As a result of the merger, the minority (i.e., the unaffiliated stockholders) were cashed out for $6.60 per share, while the controlling group stayed on with the acquiror, exchanging its 41% stake in pre-deal Allion for a combination of cash and an approximately 30% equity interest in the new, post-

Not Reported in A.3d, 2011 WL 1135016 (Del.Ch.)
**(Cite as: 2011 WL 1135016 (Del.Ch.))**

freezeout Allion.

> FN2. The H.I.G. Capital, LLC affiliates were Brickell Bay Acquisition Corporation and Brickell Bay Merger Corporation.
>
> FN3. Of the 41% controlling group, Parallex LLC was Allion's largest stockholder, owning approximately 27.5% of the outstanding shares of common stock. Raymond A. Mirra Jr. is the sole owner and manager of Parallex.

The merger was announced on October 18, 2009. In what has now become fairly typical race-to-the-courthouse fashion, various plaintiffs filed lawsuits in Delaware and elsewhere, claiming that the price paid to the minority stockholders was unfair and asserting breach of fiduciary duty claims against Allion, its directors, and H .I.G. in connection with the merger. Denise Fowler, an Allion stockholder, was first to file her complaint in New York on October 20, 2009 (her complaint was, apparently, an "extremely skeletal" placeholder according to defendants' counsel).[FN4] One week later, on October 27, 2009, Virgin Islands Government Employees' Retirement System ("VIGERS") filed suit in this Court. Two days after that, Steamfitters Local Union 449 ("Steamfitters") also filed suit in Delaware, followed by Union Asset Management Holding, AG ("Union") on November 2, 2009. Counsel for the various Delaware plaintiffs then engaged in discussions over the leadership positions each would take in the case. Steamfitters, unhappy with the non-lead role it was offered in Delaware, opted to voluntarily withdraw its action in this Court, re-file in New York, and move for co-lead plaintiff status in New York with Ms. Fowler. The New York Court granted the motion and appointed Steamfitters and Fowler (together, the "New York plaintiffs" or "objectors") co-lead status and consolidated their cases under the caption *In re Allion Healthcare, Inc. Shareholders Litigation* (the "New York Action").[FN5]

> FN4. *See* Teleconference Tr. 26 (Nov. 22, 2010).
>
> FN5. The New York Action is in the Supreme Court of the State of New York for Suffolk County, Index No. 41990/2009.

Around the same time, the Delaware actions were consolidated under the caption *In re Allion Heathcare Inc. Shareholders Litigation* (the "Delaware Action"). VIGERS and Union were appointed co-lead plaintiffs and class representatives (the "Delaware plaintiffs"). An expedited discovery schedule was entered, and a preliminary injunction hearing in Delaware was set for January 21, 2010.

**\*2** On December 10, 2009, defendants moved to stay the New York Action in favor of proceeding in Delaware, but the New York Court denied the motion on December 22, 2009. Meanwhile, by letter dated December 21, 2009, Delaware plaintiffs informed this Court that they had reached an agreement with defendants and were withdrawing their motion for preliminary injunction. The New York plaintiffs also withdrew their preliminary injunction motion in the New York Action for the same reason. Specifically, the parties (Delaware plaintiffs, New York plaintiffs, and defendants) had negotiated and agreed that Allion would make certain corrective disclosures in connection with the merger, which it did in a supplemental proxy statement filed December 22, 2009.[FN6]

> FN6. Allion had filed its preliminary proxy statement making certain earlier disclosures relating to the merger on November 2, 2009.

On January 11, 2010, Allion's stockholders overwhelmingly approved the merger. Of the 16,844,419 outstanding shares held by the unaffiliated stockholders, approximately 79% voted in favor of the merger. Of the 28,700,248 total outstanding shares, approximately 88% voted in favor of the merger-only 0.72% of the total outstanding shares voted against it. Of the 25,357,973 total shares present at the meeting, 99.18% voted in favor of the

Not Reported in A.3d, 2011 WL 1135016 (Del.Ch.)
**(Cite as: 2011 WL 1135016 (Del.Ch.))**

merger. To repeat: over 99%! The merger closed on January 13, 2010, and no stockholder demanded appraisal.

Amended complaints were filed in the Delaware and New York Actions in mid-April 2010, asserting claims arising out of the merger. Defendants filed motions to dismiss in both New York and Delaware in early May 2010. Defendants' motion to dismiss the New York Action was largely denied on August 13, 2010. [FN7] Defendants' motion to dismiss the Delaware Action was fully briefed by that point as well. In short, the Delaware and New York proceedings had essentially been running on parallel tracks, and the claims at issue were nearly identical.

> FN7. The New York Court dismissed the claims against defendants H.I.G., Brickell Bay Acquisition Corp. (it does not appear that Brickell Bay Merger Corp. was a defendant in the New York Action) and Raymond A. Mirra Jr., and denied the motion as to the other defendants.

While the motions to dismiss were pending, defendants had invited Delaware plaintiffs to mediate in early June 2010. A full-day mediation was held on August 17, 2010, but failed to result in an agreement-the mediation ended with Delaware plaintiffs at $8.5 million and defendants at $1.5 million. Settlement discussions continued through August and early September.

On September 8, 2010, the Delaware parties informed this Court that they had reached an agreement in principal to settle the Delaware Action. Also on September 8, 2010, New York plaintiffs learned of the Delaware settlement, including its amount and its terms. [FN8] Negotiations continued from there, and the Delaware parties memorialized the terms of their settlement in a memorandum of understanding on October 20, 2010.

> FN8. Teleconference Tr. 18 (Nov. 22, 2010).

*B. The Settlement*

The Delaware parties filed a stipulation of settlement on November 12, 2010. The proposed settlement resulted in a $4 million increase in the merger consideration. [FN9] On November 17, 2010, a scheduling order was entered by this Court setting a hearing date for January 19, 2011 (the "settlement hearing") at which any objectors would have the opportunity to be heard before the settlement was approved. New York plaintiffs immediately filed an emergency motion to intervene, asking this Court to either: (1) stay the action, (2) reject the proposed settlement, or (3) allow New York plaintiffs ("objectors") to take settlement-related discovery on the merits of the action and the proposed settlement reached by defendants and Delaware plaintiffs.

> FN9. The $4 million increase amounted to about twenty-three cents per share, bumping the merger price from $6.60 to $6.83. *See* Teleconference Tr. 23 (Nov. 22, 2010).

*C. The "Emergency" Motion to Intervene*

**\*3** Although New York plaintiffs filed the "emergency" motion to intervene just after the November 17 scheduling order was filed in this Court, they had in fact known about the settlement for over two months at that point (since September 8, 2010) and had even been in discussions with the Delaware plaintiffs regarding the settlement. After defendants had reached their September agreement in principle to settle with the Delaware plaintiffs, and recognizing that disposing of the New York Action would impose additional costs down the road, defendants had asked Delaware plaintiffs to reach out to New York plaintiffs in an effort to "seek global peace." [FN10] Delaware plaintiffs then did reach out to New York plaintiffs to see if they wanted to join them under the settlement umbrella. The size of the settlement was not going to change if New York plaintiffs signed on, but New York plaintiffs' counsel could have a piece of the pie, as opposed to ending up with a situation where the Delaware Action settled, disposing of the litigation

in both Delaware and New York, and leaving New York plaintiffs out of the fee award entirely—which, as it turns out, is essentially the predicament in which New York plaintiffs now find themselves.

> FN10. Settlement Hr'g Tr. 42 (Jan. 19, 2011).

It did not have to be this way. At one point, all parties appeared to be working toward a global resolution, and the lead firm for New York plaintiffs, Labaton Sucharow LLP, had agreed to support the $4 million settlement, provided New York plaintiffs' counsel received an acceptable share of the fees awarded. One of the New York plaintiffs' firms, Levi & Korsinsky, LLP, later reneged on that agreement—whether that was because they changed their mind or because they simply never authorized the Labaton firm to agree to the settlement on their behalf is of little import. The point is that the New York plaintiffs were well aware that settlement discussions between defendants and Delaware plaintiffs had been ongoing for months, that the Delaware parties had already engaged in a full-day mediation in August 2010, that in September 2010 they had reached an agreement in principle to settle the Delaware Action, and that on October 20, 2010, the Delaware parties executed a memorandum of understanding memorializing the terms of their agreement. New York plaintiffs knew all of this with plenty of time before the November 12, 2010 stipulation of settlement was filed in this Court and before the November 17, 2010 scheduling order was entered. Therefore, I denied objectors' "emergency" motion to intervene at that point and held that they could appear at the settlement hearing and object to the proposed settlement then. I did, however, grant their motion to take limited settlement-related discovery.

*D. The Settlement Hearing*

As noted above, at the settlement hearing on January 19, 2011, I approved the proposed settlement. I explained the reasons for my ruling at the settlement hearing and need not recite them all again here, but in short, I found that both the process and negotiations leading to the settlement were reasonable, and that the settlement was fair. Objectors were unable to convince me that the fundamental merits of plaintiffs' claims (either in New York or in Delaware) were strong enough to call the outcome of the settlement into serious question—it was a reasonable settlement that resulted in a real benefit (actual money) to the class. I also approved certification of the settlement class and a fee award totaling $1 million—$250,000 for improved proxy disclosures (the "disclosure fee"), to be paid by defendants, plus $750,000 for the $4 million increase in consideration for the merger (the "increased share price fee"), to be paid out of the settlement fund.

**\*4** At the time of the settlement hearing, I left it to plaintiffs' counsel in the first instance to try to work out a fee-splitting solution, but they were unable to reach an agreement. To be clear, the amount of the fee is not in dispute here—I approved the $1 million fee award at the settlement hearing. The only question remaining is how that fee award will be divided among plaintiffs' counsel. That is, how it will be split between counsel for Delaware plaintiffs (who negotiated and reached the settlement with defendants) and counsel for New York plaintiffs (who were not party to the settlement, but had parallel litigation proceeding in New York).

**II. THE MULTI–FORUM DEAL LITIGATION PROBLEM**

I note at the outset that this fee-splitting issue is yet another byproduct of the rise of multi-forum deal litigation, the fallout of which has become increasingly problematic in recent years as more and more of these cases are filed in multiple jurisdictions.<sup>FN11</sup> Judges, defense counsel, and the plaintiffs' bar are now routinely confronted with these sorts of disputes and have yet to come up with a workable solution.<sup>FN12</sup> The potential problems, as one can imagine, are numerous. Defense counsel is forced to litigate the same case—often identical claims—in multiple courts. Judicial resources are

wasted as judges in two or more jurisdictions review the same documents and at times are asked to decide the exact same motions. Worse still, if a case does not settle or consolidate in one forum, there is the possibility that two judges would apply the law differently or otherwise reach different outcomes, which would then leave the law in a confused state and pose full faith and credit problems for all involved.

> FN11. Problems associated with multi-forum deal litigation have been the subject of multiple recent opinions of this Court, academic scholarship, practitioner panels, client memos, news articles, blog posts, and more. *See, e.g., Anywhere But Chancery: Ted Mirvis Sounds an Alarm and Suggests Some Solutions,* M & A Journal (May 2007); *In re Revlon, Inc. S'holders Litig.,* 990 A.2d 940 (Del.Ch.2010); John Armour, Bernard Black & Brian Cheffins, *Is Delaware Losing Its Cases?* (Working Paper, 2010), *available at* http://ssrn.com/abstract=1578404; Joseph A. Grundfest, *Choice of Forum in Intracorporate Litigation,* Francis G. Pileggi Distinguished Lecture in Law (2010); *Scully v. Nighthawk Radiology Holdings, Inc.,* C.A. No. 5890–VCL (Transcript of Courtroom Status Conference) (Dec. 17, 2010); David Marcus, *Multiforum Mayhem,* The Deal Magazine (Jan. 11, 2011); Mark Lebovitch, Jerry Silk & Jeremy Friedman, *Making Order Out of Chaos: A Proposal to Improve Organization and Coordination in Multi–Jurisdictional Merger–Related Litigation* (2011).

> FN12. My personal preferred approach, for what it's worth, is for defense counsel to file motions in both (or however many) jurisdictions where plaintiffs have filed suit, explicitly asking the judges in each jurisdiction to confer with one another and agree upon where the case should go forward. In other words—and I mentioned this during an earlier oral argument in this case—my preference would be for defendants to "go into all the Courts in which the matters are pending and file a common motion that would be in front of all of the judges that are implicated, asking those judges to please confer and agree upon, in the interest of comity and judicial efficiency, if nothing else, what jurisdiction is going to proceed and go forward and which jurisdictions are going to stand down and allow one jurisdiction to handle the matter." Teleconference Tr. 24 (Nov. 22, 2010). Of course, as I recognized at the time, judges in different jurisdictions might not always find common ground on how to move the litigation forward. Nevertheless, this would be, I think, one (if not the most) efficient and pragmatic method to deal with this increasing problem. It is a method that has worked for me in every instance when it was tried.

Efficiency and comity would be better served if these cases were litigated in one jurisdiction. Of course, if a stay or dismissal is *not* granted in one jurisdiction, defense counsel may attempt to "forum shop" for the jurisdiction in which the best outcome for its client is likely. As has been noted recently before this Court, the forum shopping issue, in and of itself, is not necessarily problematic at all, and indeed may be "unquestionably proper or [ ] part of the zealous advocacy expected of attorneys." FN13 But it in turn does highlight the potential, at least, for collusive settlements or "reverse auctions"—even if what defense counsel is ultimately doing is simply attempting to litigate its case in one jurisdiction only, wherever that may be. Plaintiffs' counsel may similarly engage in forum shopping for the jurisdiction where the judge is most likely to approve their settlement.

> FN13. *Scully v. Nighthawk Radiology Holdings, Inc.,* C.A. No. 5890–VCL

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

(Report of Special Counsel) (Mar. 11, 2011), at 2.

The problems do not end there. In the event that defense counsel settles in Delaware over another jurisdiction, leaving one set of plaintiffs' counsel out in the cold, the unfavored forum's plaintiffs' lawyers then often flock to Delaware to oppose the settlement (and vice versa). And there are the post-settlement or post-litigation issues as well: class certification,[FN14] approval of attorneys' fees,[FN15] and then dividing those attorneys' fees between the various plaintiffs' counsel.

> FN14. *See, e.g., In re Art Tech. Group, S'holders Litig.,* C.A. No. 5955–VCL (Transcript of Telephone Conference on Issues of Class Certification and Rulings of the Court) (Jan. 19, 2011) (discussing whether to certify a class before awarding attorneys' fees in the context of mooted disclosure claims).

> FN15. *See, e.g., In re Burlington N. Santa Fe S'holders Litig.,* C.A. No. 5043–VCL, 2010 WL 4268999 (Settlement Hearing Transcript) (Oct. 28, 2010) (approving settlement and awarding attorneys' fees and expenses for "the entire litigation effort as a whole," rather than allowing "fee claim-splitting" between parties in different jurisdictions).

**\*5** The problem of dividing attorneys' fees in a multi-jurisdictional deal litigation settlement came up recently in *In re Burlington Northern Santa Fe Shareholders Litigation,* although the fee splitting issue there was different than the one presented here. There, cases had been filed in both Delaware and Texas. The parties reached a global settlement. As part of that settlement, Delaware and Texas plaintiffs' counsel retained the ability to file separate claims for attorneys' fees in Delaware and Texas. In the Delaware fee application, Delaware counsel requested an amount that it argued was a "split" fee with Texas counsel, who would be making their own motion in Texas. But the disclosure benefit achieved by Delaware and Texas plaintiffs' counsel was *exactly* the same (they had worked together in achieving the unitary benefit). In fact, the briefs filed in Texas and Delaware moving for attorneys' fees were almost identical—in large part written in precisely the same words; literally copied and pasted. In that situation, Vice Chancellor Laster ruled that there was no basis "to parse a fee into Delaware and Texas components. It's presented as a unitary disclosure benefit." Accordingly, he said, "a single court should be supervising the entire fee award," whether it be the Texas or Delaware court.[FN16] Finding that there was no way to split the benefit into Delaware and Texas components, Vice Chancellor Laster instead ruled on the fee award he deemed appropriate based on the entire litigation effort, with the "intention [ ] that this is the award for all of the benefits conferred by the litigation effort undertaken by all of the plaintiffs' counsel in this case."[FN17] Judge Womack in the Texas action later gave preclusive effect to Vice Chancellor Laster's ruling and awarded no additional fees; thus, the amount awarded in this Court was the full fee award, to be split among counsel. In that case, Vice Chancellor Laster gave lead counsel in the Delaware action authority to allocate the fee award, so the ultimate fee splitting issue there was left for plaintiffs' counsel to work out on their own.

> FN16. *Id.* at 59–60.

> FN17. *Id.* at 67.

Unlike *Burlington Northern,* the non-Delaware plaintiffs here were *not* parties to the settlement, but the fee-splitting question raised there (i.e., after settlement is approved, the settlement class is certified, and fees are awarded, how to then cut up the pie) is the one Delaware and New York plaintiffs' counsel, and now the Court, address head on in this case. At the January 19, 2011 settlement hearing, rather than give Delaware plaintiffs' counsel full authority to split the fees as Vice Chancellor Laster had done in *Burlington Northern,* I gave both sets of plaintiffs' counsel the opportunity to attempt to

work together to agree upon how to allocate the fees. They were unable to reach agreement, so the Court is now put in the unpleasant position of refereeing this food fight between Delaware and New York plaintiffs.

**\*6** Delaware plaintiffs argue that New York plaintiffs' portion should not exceed $100,000, amounting to 40% of the disclosure fee. According to Delaware plaintiffs, New York plaintiffs are not entitled to any portion whatsoever of the increased share price fee. New York plaintiffs, on the other hand, request 50% of the disclosure fee and one-third of the increased share price fee, amounting to a total of $375,000.

Defendants take no position on the fee-splitting issue. They are to pay a total of $250,000 for the disclosure fee award to plaintiffs' counsel, no matter how that amount is ultimately divided. The increased share price fee award is to be taken from the settlement proceeds. Defendants do not express a view on how either fee award should be split.

### III. ANALYSIS

All that being said, the fee splitting question here, in the end, is relatively straightforward. New York plaintiffs' counsel had the temerity to oppose this settlement on its merits, and then turn around and request a fee for the settlement that *they opposed*.[FN18] Notwithstanding the seeming irony (to me, at least) in that course of action, New York plaintiffs' counsel is, in my opinion, entitled to a share of the disclosure fee award. They are not, however, entitled to any portion of the increased share price fee award. I will address each component of the Court's fee award separately: first the disclosure fee, and then the increased share price fee.

> [FN18.] This was, of course, *after* one of those New York plaintiffs had filed suit in Delaware and then jumped ship voluntarily to New York when it was unhappy with its leadership position here. Had that plaintiff stayed in Delaware, it likely would have had a seat (whether or not the front seat, it would have had *a* seat somewhere) at the negotiating table and would have been included in the Delaware settlement. Thus, the position New York plaintiff Steamfitters now finds itself in is entirely of its own making.

*A. The Disclosure Fee Award*

The disclosure benefits were negotiated by both Delaware and New York plaintiffs' counsel. Those enhanced disclosures were contained in a supplemental proxy statement dated December 22, 2009—almost a full year before defendants reached their settlement with Delaware plaintiffs. As a result of those corrective disclosures, both Delaware and New York plaintiffs withdrew their then-pending motions for preliminary injunction. At the time, both Delaware and New York plaintiffs were satisfied with the disclosures and felt that they benefited Allion's stockholders.

New York plaintiffs contend that the corrective disclosures negotiated by their counsel "were far more material than those sought by the Delaware plaintiffs."[FN19] New York plaintiffs thus suggest that although they reasonably could request a larger share of the disclosure fee than they are actually seeking, they ask for only 50% of the $250,000 awarded for disclosure benefits.

> [FN19.] Letter from New York plaintiffs' counsel to Court 2 (Mar. 11, 2011).

Delaware plaintiffs, on the other hand, argue that although New York plaintiffs agreed to the improved disclosures at the time they were negotiated, they then "did a complete about-face" at the January 19, 2011 settlement hearing and challenged the adequacy of the disclosures[FN20] and, therefore, should not receive any of the awarded fee (or at most should receive $100,000). For this proposition, Delaware plaintiffs rely on a federal court decision in which a judge denied an objectors' motion for attorneys' fees where objectors had opposed the settlement.[FN21] The case cited by Delaware plaintiffs is inapposite for several reasons. To name

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

only a couple: First, it is a Texas district court case, and is not controlling or binding on this Court. Second, objectors there were in an entirely different position than objectors here. Objectors there had opposed a proposed settlement, including the "high attorneys' fees" requested. The Court made modifications to the settlement agreement before approving it, including lowering the fees awarded to lead counsel from 25% to 18% of the settlement fund. Objectors claimed that they played a role in the Court's decision to lower attorneys' fees, while the Court says that objectors "vastly overstate[d] their role in the Court's decision-making process." So the issue there was really more about whether objectors actually caused the Court to reduce the attorneys' fees awarded, rather than the fact that they objected to the settlement.[FN22] Finding that objectors' "representations and objections were not essential to the Court's decision,"[FN23] the Court there did not award objectors any portion of the attorneys' fees.

> [FN20.] Letter from Delaware plaintiffs' counsel to Court 1–2 (Mar. 11, 2011); *see also* Settlement Hr'g Tr. 21–23 ("THE COURT: [D]idn't you get disclosures in this case? [New York Plaintiffs' Counsel]: Yes, Your Honor; both the New York plaintiffs and the Delaware plaintiffs negotiated with the defendants and got additional disclosures. THE COURT: So you got full disclosures. [New York Plaintiffs' Counsel]: Except we don't believe we did.... [A]t the time of the stockholder vote, New York plaintiffs' counsel did believe the disclosure was made. It was not until they [later] thoroughly reviewed the documents that had been produced that they realized additional matters should have been disclosed.").

> [FN21.] Letter from Delaware plaintiffs' counsel to Court 1–2 (Mar. 11, 2011) (citing *In re Dell Inc., Sec. Litig.,* No. 06–cv–00726, Order at 2 (W.D.Tex. Jan. 11, 2011).

> [FN22.] Indeed, if objectors *had* caused the reduction in attorneys' fees, they arguably *would have* been entitled to some portion of the benefit achieved by the reduction—at least in Delaware. *See In re Cablevision/Rainbow Media Group Tracking Stock Litig.,* 2009 WL 1514925 (Del.Ch. May 22, 2009) (attributing the benefit of additional payment to the settlement class caused by the Court's reduction in attorneys' fees to the objector and awarding a percentage of that amount to objector).

> [FN23.] *In re Dell,* Order at 2.

**\*7** Here, regardless of the fact that New York plaintiffs now (somewhat incredibly) claim that the corrective disclosures they agreed to in December 2009 were not complete, they did, nonetheless, negotiate for those disclosures at the time. That is, they directly contributed to the benefit achieved by those disclosures, whether or not they object to the completeness of the disclosures now.[FN24] Both New York plaintiffs and Delaware plaintiffs negotiated independently with defendants for those improved disclosures, and each played an important role. Accordingly, New York plaintiffs and Delaware plaintiffs are both entitled to share in the disclosure fee: New York plaintiffs are awarded 50% of the fee, or $125,000, and Delaware plaintiffs are awarded the same ($125,000).

> [FN24.] Unlike the *Dell* case where, it appears, objectors did not contribute at all to the actual settlement; what objectors allegedly "contributed" to was the benefit to the class by the Court's decision to lower attorneys' fees.

**B. The Increased Share Price Fee Award**

As for the increased share price fee award (i.e., the benefit conferred by the settlement between defendants and Delaware plaintiffs), "[a]llocation of

Not Reported in A.3d, 2011 WL 1135016 (Del.Ch.)
**(Cite as: 2011 WL 1135016 (Del.Ch.))**

attorneys' fees among plaintiffs' lawyers pursuing substantially the same claims in different jurisdictions can be problematic" to the extent both sets of plaintiffs' lawyers contribute to a global settlement or otherwise confer a real benefit to the class."[FN25] This is because "a litigant who confers a common monetary benefit upon an ascertainable stockholder class is entitled to an award of counsel fees and expenses for its efforts in creating the benefit."[FN26] But out-of-state counsel is only "entitled to a share of attorneys' fees in a settlement of a Delaware action *if their efforts elsewhere conferred a benefit realized as part of the Delaware settlement.*"[FN27] And out-of-state counsel must actually "substantiate their contribution to the result achieved."[FN28]

> FN25. *In re Cablevision,* 2009 WL 1514925, at *2.
>
> FN26. *Id.* (quoting *Alaska Elec. Pension Fund v. Brown,* 941 A.2d 1011, 1015 (Del.2007)).
>
> FN27. *In re Infinity Broadcasting Corp. S'holders Litig.,* 802 A.2d 285, 292 (Del.2002) (emphasis added). In *Infinity Broadcasting,* the Delaware Supreme Court found that New York plaintiffs' counsel was not entitled to share in the fee award "because the New York litigation neither promoted nor influenced the global settlement in any meaningful way nor resulted directly in any benefit to the shareholder class." *Id.*
>
> FN28. *Alaska Elec. Pension Fund,* 941 A.2d at 1015.

Delaware courts recognize a presumption that there is a causal relationship between a timely filed suit and the benefit achieved by litigating or settling the case.[FN29] When "similar lawsuits are litigated in multiple jurisdictions, [however,] the presumption of a causal relationship generally applies *only* to the Delaware litigation."[FN30] There are many reasons why Delaware plaintiffs are usually the only ones given the presumption of causation. In *Alaska Electrical Pension Fund,* the Delaware Supreme Court laid out several of them. These include: (1) It is a reasonable presumption that if Delaware plaintiffs were the ones who negotiated the settlement, they—rather than out-of-state plaintiffs—were the ones who conferred the benefit; (2) Delaware plaintiffs appeared before the Court of Chancery during the course of the litigation and the Court thus could better determine an appropriate fee award based on its knowledge of Delaware plaintiffs' actions; (3) "[I]f the presumption were extended to all plaintiffs litigating similar claims in other jurisdictions, such a rule would encourage filing of multiple 'mere pendency' lawsuits, wasting judicial resources and making it more difficult to reach settlements."[FN31]

> FN29. *Id.*
>
> FN30. *Id.* (citing *In re Infinity Broadcasting,* 802 A.2d at 292) (emphasis added).
>
> FN31. *Id.* at 1015–16. In *Alaska Electrical Pension Fund,* the Court therefore gave full credit to Delaware plaintiffs for the benefit achieved by the settlement between defendants and Delaware plaintiffs, and found that out-of-state counsel did not contribute in any way to the settlement. Faced with a set of very "unusual circumstances" though, (a final price increase in the settlement value occurred at a time *after* the Delaware litigation had already concluded, when the out-of-state litigation was the only litigation still pending), the Court shifted the presumption of causation to out-of-state plaintiffs for that final increase alone and remanded the case. Even with the presumption shifted in their favor, the Court of Chancery on remand concluded that the out-of-state plaintiffs did not contribute to the benefit in any way, and they were awarded no portion of the attorneys' fees. *See In re William Lyon Homes*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

S'holder Litig., 2009 WL 1019738 (Del.Ch. Apr.2, 2009), aff'd, Alaska Elec. Pension Fund v. Brown, 988 A.2d 412 (Del.2010).

***8** Here, it is undisputed that New York plaintiffs are not parties to the settlement agreement reached between defendants and Delaware plaintiffs.[FN32] New York plaintiffs had an opportunity to sign on to the settlement, which they declined to do. This Court has consistently credited Delaware plaintiffs for the benefit of a settlement they negotiated.[FN33]

> FN32. See, e.g., Settlement Hr'g Tr. 12 ("Delaware plaintiffs were involved in [the mediation and later settlement discussions]. The New York plaintiffs were not.").

> FN33. See, e.g., In re Cablevision, 2009 WL 1514925, at *2 n. 10 (Del.Ch. May 22, 2009) (crediting Delaware plaintiffs with the full amount of the settlement fund in the first instance); In re William Lyon Homes S'holder Litig., 2007 WL 270428 (Del.Ch. Jan.18, 2007) (presuming that only the Delaware plaintiffs contributed to the initial price increase and awarding fees to Delaware plaintiffs), aff'd in relevant part, Alaska Elec. Pension Fund v. Brown, 941 A.2d 1011 (Del.2007).

Thus, to determine whether New York plaintiffs' counsel here conferred a benefit to the settlement class "requires an analysis of the impact that the New York litigation had on the settlement of the Delaware Action."[FN34] The only way New York plaintiffs would be entitled to any portion of the fees would be if the New York litigation somehow caused the Delaware settlement. That is, because New York plaintiffs' counsel were not involved in the settlement negotiations and did not agree to join in the global settlement, "any evidence of a benefit must result from the impact of the New York litigation itself."[FN35]

> FN34. In re Infinity Broadcasting, 802 A.2d at 293.

> FN35. Id.

Based on the evidence presented at the settlement hearing and in the substantial filings by the parties, I find that the New York litigation in no way caused any of the benefit achieved by Delaware plaintiffs in the settlement. New York plaintiffs did not negotiate an increase in the settlement consideration. Indeed, they did not negotiate any benefit or contribute to the settlement whatsoever—no part of the settlement is attributable to New York plaintiffs at all.[FN36] New York plaintiffs argue that the prosecution of their action created "the atmosphere in which the cash settlement could be achieved."[FN37] A similar argument by out-of-state counsel was squarely rejected in *Cablevision*. There, New York plaintiff asserted that the New York Action "encouraged the Defendants to settle the Delaware action" and that the initial settlement "was enhanced" by plaintiff's efforts in New York. The Court rejected the assertion for two reasons: "First, the impact of the New York Action on the Delaware Action is a matter of conjecture. Second, as a general matter, the settlement of the Delaware Action should be taken at face value for what it purports to be—a settlement achieved by counsel for the Delaware Plaintiffs—at least in the absence of a sufficient evidentiary basis to the contrary."[FN38]

> FN36. Contrast this result with a case like *In re Cablevision*, where New York plaintiffs actually succeeded in negotiating an additional $1.5 million in the settlement amount (as well as persuading the Court to lower the percentage of attorneys' fees).

> FN37. Letter from New York plaintiffs' counsel to Court 2 (Mar. 11, 2011).

> FN38. In re Cablevision, 2009 WL 1514925, at *2 n. 10.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Here, there is no "sufficient evidentiary basis to the contrary." New York plaintiffs rely heavily on the fact that defendants' motion to dismiss the New York Action was in part denied, and they quote defendants' counsel as saying that that "move[d] things in favor of the Delaware plaintiffs for purposes of completing the settlement negotiations." [FN39] But the evidence presented at the settlement hearing directly contradicted New York plaintiffs' arguments. [FN40] Defense counsel, contrary to New York plaintiffs' assertions, did *not* believe that this Court was going to stay the Delaware Action had the Delaware parties not settled, nor did Delaware plaintiffs' counsel—and I made very clear during the settlement hearing that I was not, in fact, going to stay the Delaware Action. Defendants settled with Delaware plaintiffs because they believed it was a fair settlement, and both parties recognized the risks inherent in litigation. Unfortunately, what this means for New York plaintiffs is that because I find no causal connection between their efforts in New York and the settlement in Delaware, New York plaintiffs "are left with nothing more than having undertaken a parallel action in a different forum." [FN41] Delaware plaintiffs are awarded the full increased share price fee award of $750,000.

> [FN39]. Letter from New York plaintiffs' counsel to Court 2 (Mar. 11, 2011).
>
> [FN40]. *See* Settlement Hr'g Tr. 54–55.
>
> [FN41]. *In re William Lyon Homes S'holder Litig.,* 2007 WL 270428, at *2 (Del.Ch. Jan.18, 2007).

**\*9** For the foregoing reasons, New York plaintiffs are awarded $125,000 in fees and expenses, and Delaware plaintiffs are awarded $875,000 in fees and expenses.

IT IS SO ORDERED.

Del.Ch.,2011.
In re Allion Healthcare Inc. Shareholders Litigation
Not Reported in A.3d, 2011 WL 1135016 (Del.Ch.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.