BROWN & GOULD, LLP
STEVEN B. GOULD
7700 Old Georgetown Rd., Suite 500
Bethesda, MD 20814
Telephone: 301-718-4548
301-718-8037 (fax)

ROBBINS GELLER RUDMAN
 & DOWD LLP
STUART A. DAVIDSON
CULLIN A. O'BRIEN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone: 561/750-3000
561/750-3364 (fax)

Attorneys for Plaintiff Andrei Sinioukov

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

(ALEXANDRIA DIVISION)

| | |
|---|---|
| ANDREI SINIOUKOV, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>vs.<br><br>SRA INTERNATIONAL, INC., DR. ERNST VOLGENAU, JOHN W. BARTER, LARRY R. ELLIS, MILES R. GILBURNE, W. ROBERT GRAFTON, WILLIAM T. KEEVAN, MICHAEL R. KLEIN, DR. STANTON D. SLOANE, DR. GAIL R. WILENSKY, PROVIDENCE EQUITY PARTNERS LLC, STERLING PARENT INC., and STERLING MERGER INC.,<br><br>          Defendants. | Civil Action No. 1:11-cv-00447-LO -TRJ<br><br>**PLAINTIFF'S BENCH MEMORANDUM ON THE PENDING DISCLOSURE PROBLEMS WITH THE CORPORATE TAKEOVER** |

Plaintiff Andrei Sinioukov ("Plaintiff") respectfully submits the following bench memorandum on the pending disclosure problems with the takeover of SRA International, Inc. ("SRA" or the "Company") by Providence Equity Partners LLC ("Providence"). Accordingly, Plaintiff states:

**POINT #1: It Cannot Be Disputed that Where there Are Material Omissions in a Proxy Solicitation, it Manifests in Irreparable Harm**

1.  It is well settled that irreparable harm is established as a result of dissemination of proxy solicitation materials that contain material misrepresentations and/or omissions, and when such solicitation materials seek shareholder support of a fundamental business transaction such as a merger. *See, e.g.*, *Morris v. Bush*, No. 3:98-CV-2452-G, 1999 U.S. Dist. LEXIS 9994, at *13 (N. D. Tex. June 23, 1999) (citing *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 383 (1970)); *Mony Group, Inc. v. Highfields Cap. Mgmt.*, *L.P.*, 368 F.3d 138, 147 (2d Cir. 2004); *ICN Pharms., Inc. v. Khan*, 2 F.3d 484, 489 (2d Cir. 1993); *MAI Basic Four, Inc. v. Prime Computer, Inc.*, 871 F.2d 212, 218 (1st Cir. 1989); *Polaroid Corp. v. Disney*, 862 F.2d 987, 1006 (3d Cir. 1988); *Marshall Field & Co. v. Icahn*, 537 F. Supp. 413, 416 (S.D.N.Y. 1982); *accord ODS Techs., L.P. v. Marshall*, 832 A.2d 1254, 1262 (Del. Ch. 2003); *In re Pure Res., Inc. S'holders Litig.*, 808 A.2d at 452-53 (Del. Ch. 2002).

**POINT #2: The Only Appropriate Remedy to Address this Irreparable Harm Is the Issuance of an Injunction Requiring the Dissemination or Correction of Material Information Prior to a Shareholder Vote**

2.  When a proxy solicitation lacks material information, it is appropriate for a court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected to avoid having to "'unscramble the eggs'" following the

completion of an infirm shareholder vote.  *See Phototron Corp. v. Eastman Kodak Co.*, 687 F. Supp. 1061, 1071 (N.D. Tex. 1988) ("physical assets sold, and commercial arrangements permanently altered . . . [are] the sort of 'scrambled eggs' that cannot be 'unscrambled' through monetary damages"), *rev'd on other grounds*, 842 F.2d 95 (5th Cir. 1988); *Michigan Citizens for an Indep. Press v. Thornburgh*, No. 88-2322, 1988 U.S. Dist. LEXIS 16576, at *18 (D.D.C. Aug. 17, 1988) (finding irreparable injury from merger because consolidation would make it "very difficult to reassemble this egg once it has been scrambled"); *Laidlaw Acquisition Corp. v. Mayflower Group, Inc.*, 636 F. Supp. 1513, 1517 (S.D. Ind. 1986) ("The virtual impossibility of 'unscrambling the scrambled eggs,' once these parties are joined in corporate (shotgun) matrimony . . . constitutes . . . irreparable harm . . . .").  A denial of an injunction will forever foreclose shareholders' ability to make an informed decision on this fundamental question concerning the very corporate existence of Inspire.  *See Marshall Field*, 537 F. Supp. at 416 (concluding that irreparable harm exists in a change of control transaction where shareholders are denied "important and legally required information . . . which may affect their judgment as to whether their stock should sold . . . or held").

Vindication of the recognized right to cast an informed decision "requires a specific remedy such as an injunction, rather than a substitutionary remedy such as damages."  *Gilmartin v. Adobe Resources Corp.*, No. 12467, 1992 Del. Ch. LEXIS 80, at *43 (Del. Ch. Apr. 6, 1992); *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051 (Del. Ch. 1987); *Joseph v. Shell Oil Co.*, 482 A.2d 335, 344 (Del. Ch. 1984).  Indeed, as was stated in *Polaroid Corp. v. Disney*:

> Irreparable harm arises because of the difficulty of proving money damages in a suit based on material misrepresentations . . . . While Congress has determined that accurate disclosure is important to shareholders, it would often be impossible for shareholders to prove that . . . accurate disclosure would have affected their decision making in a particular way with concomitant quantifiable monetary loss.  The

inadequacy of a remedy at law and the importance that Congress has attached to accurate disclosure of material information establishes irreparable harm.

*Polaroid*, 862 F.2d at 1006.

> **POINT #3:** **Although Defendants Have Capitulated to, and Therefore Mooted, Some of Plaintiff's Claims Regarding Missing Material Information, SRA Shareholders Are Still Being Deprived of the Ability to Cast Intelligent, Informed, and Rational Votes on Whether or Not to Accept the Takeover of SRA by Providence**

3. Plaintiff's complaint identified six categories of material information that were being withheld from SRA shareholders at the time the preliminary proxy statement was filed on April 18, 2011. [Dkt. No. 1, ¶48]. Black letter law requires an injunction prohibiting the shareholder vote unless and until these disclosures have been made. [*Compare*, *e.g*., Dkt. No. 1, ¶48(a) (identifying lack of financial projections) *with In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 203 (Del. Ch. 2007) (enjoining shareholder vote until financial projections were made); Dkt. No. 1, ¶48(b) (identifying lack of disclosure regarding controlling shareholder's interest in transaction) *with Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261 (Del. 1989) (requiring fair process); Dkt. No. 1, ¶48(c)-(d) (identifying lack of explanation of assumptions related to Selected Companies, Selected Transaction, and Discounted Cash Flow Analyses) *with Maric Capital Master Fund, Ltd. v. Plato Learning, Inc*., 11 A.3d 1175, 1176-78 (Del. Ch. 2010) (enjoining shareholder vote until intellectually inaccessible financial analyses were clarified); Dkt. No. 1, ¶48(e) (identifying lack of disclosure regarding financial advisor's interest in Takeover) *with  In re Del Monte Foods Co. S'holders Litig.*, C.A. No. 6027-VCL, 2011 WL 532014, at * 16 (Del. Ch. Feb. 14, 2011) ("Because of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, [courts require] full disclosure of investment banker

compensation and potential conflicts."); Dkt. No. 1, ¶48(f) (identifying lack of disclosure concerning process by which defendants entered into the Takeover agreement) with *Netsmart*, 924 A.2d at 209 (enjoining shareholder vote until incomplete disclosures concerning process leading up to corporate takeover were disclosed)].

4. On June 15, 2011 and July 8, 2011, Defendants mooted two of these disclosure problems with additional proxy filings with the SEC. [*See* Dkt. No. 1, ¶¶48(a) (financial projections), (e) (fees received by financial advisors)]. There still remain material omissions for which an injunction should issue.

### ****Remaining Disclosure Item #1, Dkt. No. 1, ¶48(b): Details About Volgenau's Option Are Material

5. Defendant Volgenau is a controlling shareholder who stands on both sides of this corporate takeover of SRA by Providence. Corporate law recognizes that additional scrutiny should be given in such circumstances where a controlling shareholder stands to gain in a corporate transaction in a manner that is different than the company's shareholders. *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110 (Del. 1994). As applied here, in order to determine whether this takeover of SRA is in their best interests or was simply structured to benefit Defendant Volgenau, SRA shareholders must have a full picture of what Defendant Volgenau stands to gain as a result of the takeover. Defendants do not give shareholders the full picture. Indeed, Defendants only tell part of the story and are obligated to complete the loop. *See, e.g., Arnold v. Soc'y for Sav. Bancorp*, 650 A.2d 1270, 1280 (Del. 1994) ("[O]nce the defendants traveled down the road of partial disclosure of the history leading up to [a merger], they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events."); *Maric*, 11 A.3d at 1177 ("Because the proxy statement spoke on this subject, there was a duty to do so in a non-misleading fashion.");

*Netsmart*, 924 A.2d at 203 ("Once a board broaches a topic in its disclosures, a duty attaches to provide information that is 'materially complete and unbiased by the omission of material facts.'").

6. Specifically, in the proxy materials, Defendants explain that Defendant Volgenau has entered into an agreement with Providence that allows him to rollover $150 million worth of his holdings in SRA. *See* Definitive Proxy at 47-48, 57, and 66-67. In this agreement, Defendant Volgenau has an option to convert $120 million of his $150 million into shares in the post-takeover entity and obtain the remaining $30 million in the form of a promissory note **_or_** to convert his entire $150 million into shares in the post-takeover entity. Defendants only detail the first part of this option with a chart on page 48 of the Definitive Proxy, which contemplates what would happen in the event that Defendant Volgenau converted only $120 million of his $150 million into shares of the post-takeover entity, including Defendant Volgenau's percentage ownership in that post-takeover entity.

7. The second part of the option, where Defendant Volgenau is able to convert the full $150 million of his equity in SRA into shares in the post-takeover entity, is left studiously unanalyzed. Whereas Defendants went through the trouble of articulating figures on a chart with how much of the post-takeover entity Defendant Volgenau would own in the first option – and thereby acknowledging the materiality of the disclosure, Defendants simply leave it up to shareholders to guess how those same metrics would play out if the second option was exercised. Shareholders should not have to guess at this. What Defendant Volgenau stands to gain in this transaction is fundamental to shareholders' votes. Without fully knowing how the exercise of Defendant Volgenau's option would materialize beneficially for Defendant Volgenau, shareholders are unable to truly analyze whether the takeover by Providence is more about benefitting Defendant Volgenau than it is about benefitting the shareholders.

8. For that reason, an injunction should issue requiring Defendants to disclose how the second option would materialize for Defendant Volgenau in the same level of detail that Defendants disclose the metrics for the exercise of the first option, including an explanation of the terms of the $30 million promissory note.

**\*\*\*\*Remaining Disclosure Item #2, Dkt. No. 1, ¶48(d): Details About the Terminal Multiples in Houlihan's Discounted Cash Flow Analysis Are Material**

9. Courts issue injunctions to cure intellectually inaccessible financial analyses. A recent example of this is in the *Maric* case, where the court found:

> First, the proxy statement presented a materially misleading description of how Craig–Hallum, the investment bank that provided the PLATO board with a fairness opinion, came to its discount rate for its discounted cash flow valuation.
>
> \* \* \*
>
> Because the proxy statement spoke on this subject, there was a duty to do so in a non-misleading fashion. As important, because the failure to describe what the banker actually came up with in its (as noted) quite high WACC, the proxy statement presents a range that suggests that the merger price is far more attractive than what the Craig–Hallum valuation would have shown had it used the discount rate generated by Craig–Hallum's actual "analysis of PLATO Learning's weighted average cost of capital." This, in my view, bears materially on the decision to be made by PLATO's stockholders. Unless the proxy statement is supplemented by a corrective disclosure indicating the value that would be obtained by using the discount rates Craig–Hallum actually calculated, the merger will be enjoined.

*Maric*, 11 A.3d at 1176-78.

10. The point is that valuation analyzes by financial advisors like Houlihan Lokey Capital, Inc. ("Houlihan") are put into shareholder proxies because they are important and provide a gauge for determining the fairness of the given corporate takeover. Such analyses, however, are useless and, indeed, materially misleading where they are not transparent enough for shareholders to understand certain fundamental premises underlying the analyses. Otherwise, it cannot be known whether a financial advisor like Houlihan picked numbers arbitrarily or in a manner that makes the deal look for favorable than it otherwise would, as the *Maric* court noted.

11.     Here, Houlihan has left two critical unstated assumptions that render three of its analyses materially misleading. The first concerns how Houlihan selected the terminal multiples used in its discounted cash flow analysis. A discounted cash flow analyses projects out the future performance of the company and discounts that projection by present value assumptions. Terminal multiples are used in projecting future performance are directly proportionate to how the ultimate performance is measured – the higher the terminal multiple, the lower the projected future value. Thus, the selection of terminal multiples are a key assumption and must be derived from somewhere. Here, however, Houlihan does not state from where the assumption of the terminal multiples came. Without knowing this assumption, shareholders are unable to determine whether Houlihan's analysis is worthy of credence. Indeed, the importance of stating this assumption is clear when looking at many other Houlihan opinions disclosed to shareholders in other corporate takeovers. *See* **Exhibit "A."** In these opinions, Houlihan provides bases for where the terminal multiples came, but not here. An injunction should issue to require Houlihan to state the assumption underlying the terminal multiples it used.

### ****Remaining Disclosure Item #3, Dkt. No. 1, ¶48(f): Details About the Process and Whether the Takeover Was Structured to Benefit Defendant Volgenau to the Detriment of SRA Shareholders Are Material

12.     As stated above and in Plaintiff's Complaint, the elephant in the living room is the question of whether Defendant Volgenau orchestrated the takeover of SRA to benefit himself personally or whether the takeover of SRA is actually a good thing for SRA shareholders. Ostensibly, the proxy filings are meant to answer this obvious, overriding question and set shareholders' minds at ease. Indeed, the proxy goes through a "Background of the Merger" section

which puts forth a story of the process undertaken by the Defendants that lead to SRA's Board accepting the takeover by Providence.

13. Yet this story leaves more questions than it answers, as Plaintiff details in his complaint:

> **How many strategic buyers did not want Defendant Volgenau involved in the process or the post-merger entity?**
>
> **What were the objectives, powers and duties of the "strategic alternatives study team"; why was it created; who authorized its creation; and how many directors were on the team?**
>
> **Besides Houlihan Lokey, what was the other financial advisor considered by the Board; and why wasn't that financial advisor selected?**
>
> **How many potential suitors did the Company initiate contact with during the bidding process? Which ones were strategic suitors? Which ones were financial suitors?**
>
> **Why did Strategic Bidder E drop out of the process?**
>
> **As of March 28, 2011, what were the respective rollover and voting agreement terms on the table for Providence and Financial Bidder A, respectively?**
>
> **Why did Financial Bidder A drop out of the process?**

[Dkt. No. 1, ¶48(f)].

14. These remaining questions bear directly upon the overriding issue about whether the takeover of SRA is fair to its shareholders and represents the best value in light of other corporate possibilities. *See Netsmart*, 924 A.2d at 209 (enjoining shareholder vote until incomplete disclosures concerning process leading up to corporate takeover were disclosed). Indeed, even Defendants acknowledged that there are holes in the story they told shareholders in this "Background of the Merger" section, as on July 8, 2011, Defendants "supplemented" the section with the following additional disclosure:

> On March 3, 2011, Dr. Volgenau discussed a potential strategic transaction with Strategic Bidder B.
>
> The meetings that occurred on February 24, 2011, February 28, 2011, March 3, 2011, and March 11, 2011 between Dr. Volgenau and Financial Bidder A, Providence, Strategic Bidder B and Strategic Bidder C, respectively, were arranged by Houlihan Lokey at the direction of the special committee, based on the special committee's decision at its February 21, 2011 meeting that the bidders who had submitted written indications of interest would be given an opportunity to meet with Dr. Volgenau to discuss a potential transaction with him, including possible rollover, voting or similar arrangements. During these meetings with bidders, Dr. Volgenau expressed his desire that SRA's name, values and culture be preserved following a transaction. No individuals from the special committee or its advisors (including Houlihan Lokey) attended those meetings. After each meeting concluded, representatives of Houlihan Lokey met with Dr. Volgenau to discuss the meeting, then subsequently updated the special committee with the information gathered from Dr. Volgenau. This information included that Dr. Volgenau had expressed his receptiveness to a potential transaction with each of the bidders.

http://sec.gov/Archives/edgar/data/906192/000095012311064740/y91956ae8vk.htm (last visited July 14, 2011).

15. This July 8, 2011 disclosure did not clear up the problem. There is not sufficient detail in the "Background of the Merger" section with respect to critical points in the process and considerations of buyers other than Providence such that it would be able provide SRA shareholders with sufficient information to critically determine whether the takeover is in their best interests. An injunction must issue to require Defendants to provide shareholders with this missing material information.

## CONCLUSION

An injunction should issue to require the disclosure of the aforementioned information at least one week before a shareholder vote is to be held on the corporate takeover.

| | |
|---|---|
| DATED: July 14, 2011 | BROWN & GOULD, LLP<br>STEVEN B. GOULD (BAR NO. 45410) |

*/s/*<br>STEVEN B. GOULD

7700 Old Georgetown Rd.
Suite 500
Bethesda, MD 20814
Telephone: 301-718-4548
301-718-8037 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
STUART A. DAVIDSON
CULLIN A. O'BRIEN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
RANDALL J. BARON
A. RICK ATWOOD, JR.
DAVID T. WISSBROECKER
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff and the Class